PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15665–79.     Filed March 22, 1982.

*Harry K. Mansfield,* for the petitioner.
*David N. Brodsky,* for the respondent.

OPINION

TANNENWALD, *Chief Judge*: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| *Year* | *Deficiency* |
|--------|-------------|
| 1968 ........................................... | $96,097 |
| 1971 ........................................... | 71,097 |
| 1972 ........................................... | 726,906 |
| 1975 ........................................... | 1,183,857 |

The sole issue presented is whether petitioner may use a method of accounting for filing its tax returns which causes it to defer until 1976 recognition of income attributable to certain sales of electricity occurring in December of 1975.[1]

This case was submitted fully stipulated pursuant to Rule 122.[2] The stipulation of facts is incorporated by this reference.

Petitioner is a New Hampshire corporation engaged in the electric utility business and is the largest electric utility in New Hampshire. It operates a single integrated system furnishing electric service to more than 250,000 customers in over 190 New Hampshire municipalities, including about 83 percent of the total population of that State, and in 6 towns in Vermont and 13 towns in Maine. Petitioner timely filed consolidated corporation income tax returns for the calendar years 1968, 1971, 1972, 1974, and 1975 on the accrual method with the Internal Revenue Service Center at Andover, Mass.

Petitioner distributes electricity to several classes of retail customers, including residential, commercial, and industrial customers. The rates charged to retail customers in New Hampshire, Maine, and Vermont are subject to the regulatory authority of the New Hampshire Public Utilities Commission (NHPUC), the Public Utilities Commission of Maine (MPUC), and the Vermont Public Service Board (VPSB).

Under the rules of the NHPUC, the VPSB, and the MPUC, petitioner is required to file tariffs for retail customers setting forth the rates charged by category of customer and the terms of service. These tariffs are subject to the approval of the

---

[1] The deficiency determined for 1975 reduced petitioner's investment credit carryback to 1968 and its 1974 net operating loss carryback to 1972 and 1971, thereby creating the deficiencies for the earlier years. See sec. 6501(h). Our determination will also resolve the same issue in respect of 1974 to the extent that such year is before us in determining petitioner's net operating loss for that year which affects petitioner's tax liability for the years before us.

[2] All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in dispute.

regulatory agency with which they were filed. The tariffs so filed with the NHPUC, the VPSB, and the MPUC, applicable in 1974 and 1975, all provided for a basic charge per kilowatt hour of electricity sold which decreased as the amount of electricity delivered to a customer during a billing period increased and further provided in some instances for demand charges or discounts based on long hours' use during the monthly billing period.

The tariffs for wholesale customers, such as other power companies, applicable to petitioner in 1974 and 1975, were subject to the regulatory authority of the Federal Power Commission. The tariffs were contained in contracts filed with the Federal Power Commission and provided for a charge based upon maximum demand during the monthly billing period.

The tariffs for both retail and wholesale customers provided that customers were to be billed monthly. For example, section 2b of the general tariff approved by the New Hampshire Public Utilities Commission provided in part:

b. Charges for service under rates in this Tariff are predicated upon monthly billing, which as far as practicable will be thirty (30) days apart, and will be due upon presentation of bill. * * *

The specific tariffs approved by the NHPUC for various classes of service stated that the rate for the particular class was "net, billed monthly and payable upon presentation of bill." The tariffs governing petitioner's business further provided that petitioner could not discontinue service for nonpayment unless a bill was unpaid for a specified period of time. In order to engage in other than monthly billing, new tariffs would have to have been submitted by petitioner to the appropriate regulatory agencies and approved by them.

In accordance with the tariffs, petitioner read meters and billed its customers on a monthly basis in 1974 and 1975. Meters were not all read at month's end but instead were read on a cycle basis with a particular meter's being read on a day each month approximately 1 month from the prior reading of the meter. Residential meters were read at evenly spaced intervals over the month while industrial and other large customer meters were usually read toward the end of any month. Bills for electricity used by the customer during the monthly billing period (or, in instances where a meter could

not be read, estimated to have been used) were sent to customers within approximately 10 days from the meter reading date. The amount so billed was, however, credited to revenue in the month in which the meter reading took place and was debited to accounts receivable in that month with the result that a meter read on December 31 was considered December revenue even though the bill was not sent out until the following year.

From at least as early as 1934, petitioner consistently, for income tax purposes, accrued revenue from the sale of electricity on the basis of its meter reading and billing cycle, the so-called meter reading and billing cycle method. Under this method, petitioner accrued as income all amounts billable during the year based upon its meter reading cycle. In each year, therefore, petitioner accrued the gross income billable for the electricity used (or, in instances where a meter could not be read, estimated to have been used) by each customer for all meter reading dates falling within the year. As a consequence, the income accrued during the year for a particular meter would include revenue billable for electricity delivered during the period from the meter reading date falling in December of the prior year through the end of the prior year. The income accrued during the year did not include any income in respect of electricity delivered during the period from the meter reading date falling in December of that year to the end of that year, the so-called unbilled revenue. Petitioner deducted for Federal income tax purposes the costs of producing and delivering electricity in the year that the production and delivery occurred, with the result that, in each year, it deducted such costs for the period after the last meter reading date in the year through the end of the year, but did not deduct such costs for the period after the last meter reading date in the prior year through the end of the prior year. The costs of meter reading and billing for electricity delivered after the last meter reading date in the year were not, however, deducted currently as these activities had not been performed by the end of the year.

In contrast with the method of accounting used for Federal income tax purposes, petitioner recorded estimated unbilled revenue at the end of the year for book and financial accounting purposes (but not income tax purposes), a practice

which it had followed from at least as early as 1934. The unbilled revenue was included in income by petitioner in all its certified financial reports submitted to shareholders, creditors, and regulatory agencies. The amount of unbilled revenue so recorded as income for book and financial accounting purposes was not, however, included within the accounts receivable in the financial accounts of the petitioner but was instead included in a separate category entitled "Unbilled Revenue" included within the current assets of the petitioner.

The estimate of unbilled revenue recorded for book purposes was an aggregate estimate and was not based on a customer-by-customer estimate of electricity used between the last meter reading date in the year and the end of the year. In addition, the method of estimating the unbilled revenue changed in 1975. For 1974, the amount so recorded was equal to a 12-month moving average of the estimated aggregate unbilled revenue at the beginning of each month during the year for petitioner's residential and commercial customers and a 4-month moving average of the estimated aggregate unbilled revenue at the beginning of the months of September through December 1974 for petitioner's industrial, wholesale, and other large customers. During 1975, the amount so recorded was equal to a 12-month moving average of the estimated aggregate unbilled revenue at the beginning of each month of the year for all customers. In calculating the moving average, the aggregate unbilled revenue at the beginning of any month was estimated by multiplying the revenue actually accrued in the month through the meter reading date in the month (determined for a particular customer or group of customers whose meters were read on a particular date) by a fraction the numerator of which was the number of days in the billing period falling within the preceding calendar month (and which was thus unbilled at the end of that month) and the denominator of which was the total number of days in the billing period ending within the current month.

A summary calculation of unbilled revenue recorded at December 31, 1974, and December 31, 1975, is as follows:

| 1974 | Residential and commercial | Industrial, wholesale and other large customers | Total |
|------|----------------------------|-------------------------------------------------|-------|
| Jan. 1 | $2,967,410 | --- | |
| Feb. 1 | 3,087,217 | --- | |

| | | | |
|---|---|---|---|
| Mar. 1 | $2,777,108 | --- | |
| Apr. 1 | 3,373,781 | --- | |
| May 1 | 3,187,875 | --- | |
| June 1 | 3,228,300 | --- | |
| July 1 | 2,980,306 | --- | |
| Aug. 1 | 2,986,346 | --- | |
| Sept. 1 | 3,137,819 | $601,533 | |
| Oct. 1 | 3,317,954 | 739,503 | |
| Nov. 1 | 3,678,623 | 703,703 | |
| Dec. 1 | 4,068,491 | 835,124 | |
| Total | 38,791,230 | 2,879,863 | |
| Recorded at | | | |
| Dec. 31, 1974 | 3,232,603 | 719,966 | $3,952,569 |
| | (average for 12 months) | (average for 4 months) | |

| 1975 | Residential and commercial | Industrial, wholesale and other large customers | Total |
|---|---|---|---|
| Jan. 1 | $4,978,876 | $810,926 | |
| Feb. 1 | 4,521,343 | 722,101 | |
| Mar. 1 | 3,996,978 | 544,639 | |
| Apr. 1 | 4,571,570 | 844,764 | |
| May 1 | 4,262,265 | 776,824 | |
| June 1 | 3,996,034 | 952,190 | |
| July 1 | 3,758,599 | 702,561 | |
| Aug. 1 | 4,163,170 | 773,654 | |
| Sept. 1 | 3,874,721 | 900,583 | |
| Oct. 1 | 3,863,525 | 789,045 | |
| Nov. 1 | 3,858,745 | 714,066 | |
| Adjustment | | | |
| Nov. 1 | [1](1,010,256) | [1](204,000) | |
| Dec. 1 | 4,613,659 | 1,078,015 | |
| Total | 49,449,229 | 9,405,368 | |
| Recorded at | | | |
| Dec. 31, 1975 | 4,120,769 | 783,781 | $4,904,550 |
| | (average for 12 months) | (average for 12 months) | |

[1]Adjusted to eliminate the cumulative effect of a surcharge applicable during the period from May through November 1975 to collect a rate deficit attributable to the period from January to June 1974.

Petitioner's independent public accountants annually prepared working papers which reconciled the books maintained by petitioner, which included the estimate of unbilled revenue, with the income reported for Federal income tax purposes, which is determined through use of the meter reading and billing cycle method. These working papers contain reconciling journal entries for all differences between book and taxable income and include journal entries which reverse the recognition of estimated unbilled revenue and which result in

recognition of billable revenue determined through use of the meter reading and billing cycle method.

Petitioner's income tax returns for the taxable years 1934 and 1938 were examined by the Internal Revenue Service and, after consideration of the issue,[3] petitioner was allowed to continue use of the meter reading and billing cycle method of accounting and was not required to accrue the unbilled revenue for income tax purposes. Since 1938, petitioner's income tax returns have been regularly examined by the Internal Revenue Service, and no adjustment had been proposed with regard to the treatment of unbilled revenue until the 1974 taxable year.

Consistent with its longstanding prior practice, petitioner filed its returns for the 1974 and 1975 taxable years employing the meter reading and billing cycle method. The difference between the unbilled revenue recorded for book purposes and the revenue accrued through use of the meter reading and billing cycle method for Federal income tax purposes was disclosed on Schedule M–1, "Reconciliation of Income per Books with Income Per Return," together with more than 20 other instances in which the book method of accounting differed from the method of accounting used in the return.

The meter reading and billing cycle method of accounting employed by petitioner for Federal income tax purposes is a generally accepted accounting method employed in the utility industry for book and financial accounting purposes. For book and financial accounting purposes, a majority of major public utilities do not record unbilled revenue. If petitioner had employed the meter reading and billing cycle method of accounting for book and financial accounting purposes, respondent would have accepted that method of accounting as clearly reflecting income for Federal income tax purposes and would not have required petitioner to change its method of accounting to one which would recognize unbilled revenue as income. See Rev. Rul. 72–114, 1972–1 C.B. 124.

In the notice of deficiency forming the basis of the instant

---

[3]Since petitioner had been recording its estimated unbilled revenue for the end of the year for book and financial accounting purposes (but not income tax purposes) since as early as 1934, we infer that the "issue" considered encompassed this disparity of treatment as well as the use of the meter reading and billing cycle method of accounting as such.

dispute, respondent gives the following explanation for his attack on petitioner's method of tax accounting—

It is determined that the method used in reporting your income from sales of electricity to your customers, * * * referred to as the meter reading and billing cycle method of accounting, does not clearly reflect income and since you regularly compute your income from such sales on the accrual method of accounting for book and financial statement purposes, said method should also be used to report income for tax purposes. * * *

Respondent cites section 446 as authority for this determination. It reads in pertinent part—

SEC. 446(a). GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

Respondent has not argued that section 446(a) denies petitioner the opportunity to use the meter reading and billing cycle method of accounting for computing its taxable income, although the stipulated facts make clear that petitioner accrued the unbilled December revenue on its financial (i.e., nontax) books. This perhaps can be explained by petitioner's long history of maintaining a formal schedule reconciling its financial and tax books, for respondent has taken the position that a taxpayer's "books" for purposes of section 446 include "a reconciliation of any differences between [the taxpayer's regular books of account] and his return." Sec. 1.446–1(a)(4), Income Tax Regs. Moreover, respondent has ruled that a taxpayer may employ distinct tax and financial treatments for specific items such as accelerated depreciation (see Rev. Rul. 59–389, 1959–2 C.B. 89), and, for a variety of items such as tax-exempt income, disparate tax and financial reporting is inevitable. See generally 4 B. Bittker, Federal Taxation of

Income, Estate and Gifts, pars. 105.1.5 - 105.1.7 (1981); Falk, "Tax Accounting and Business Accounting: How To Maintain Two Sets of Books to the Satisfaction of the Treasury," 28 N.Y.U. Inst. on Fed. Tax. 19 (1970). In addition, the goals of financial accounting and tax accounting are often different. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 543–544 (1979). In view of the foregoing, we are not inclined to attempt to posit our decision herein simply on the basis of whether petitioner's method of accounting conforms to the requirements of section 446(a). Compare *St. Luke's Hospital, Inc. v. Commissioner*, 35 T.C. 236, 247–248 (1960);[4] *Geometric Stamping Co. v. Commissioner*, 26 T.C. 300, 306 (1956).

In light of respondent's statement in the notice of deficiency (see pp. 451–452 *supra*) and of the language of section 446(b), petitioner's briefs are filled with its demonstration that the meter reading and billing cycle method of accounting clearly reflects its income. To these arguments of petitioner, respondent makes a curious reply:

> The respondent agrees that I.R.C. § 446(b) gives him the power to change a taxpayer's method of accounting only if such method does not clearly reflect income. However, I.R.C. § 446(b) is not the controlling provision in the instant case. I.R.C. § 446(c)(4) and Treas. Reg. § 1.446–1(c)(2)(ii) provide the respondent with broad powers to insure that so-called "hybrid" methods of accounting clearly reflect income. * * * There can be no question that the petitioner's meter reading and billing method is a "hybrid" method, since under normal accrual concepts the income attributable to consumption of electricity after the December meter reading date to year end clearly is currently accruable.

Whether petitioner's unbilled December revenues are properly accruable in December within the meaning of section 1.446–1(c)(1)(ii), Income Tax Regs., is the linchpin of respondent's argument under section 446(c), because if they are *not* properly accruable, then petitioner's meter reading and billing cycle method of accounting is an accrual method within the meaning of respondent's regulations, and, as such, it is a "permissible method" pursuant to section 446(c)(2). That is, respondent's arguments under section 446(c)(4) are premised

---

[4] We note that, as in *St. Luke's Hospital, Inc. v. Commissioner*, 35 T.C. 236 (1960), the taxpayer kept its books in such a fashion that the unbilled December revenues were separately accounted for and, therefore, those books were sufficiently clear to reflect petitioner's income excluding such revenue. See 35 T.C. at 247–248.

on our finding that petitioner's method of accounting is a "hybrid" (i.e., a combination of methods) rather than an accrual method, and thus it turns on a mixed question of fact and law. See, e.g., *Midwest Motor Express, Inc. v. Commissioner*, 27 T.C. 167, 180–182 (1956), affd. 251 F.2d 405, 410 (8th Cir. 1958); *Dingle-Clark Co. v. Commissioner*, 26 T.C. 782, 790–791 (1956).

Respondent's notice of deficiency fails to allude to this argument that petitioner's method of accounting is impermissible under section 446(c), and in his answer filed in this case, respondent did not supplement the notice. Petitioner's arguments on brief confine themselves to refuting respondent's contention that petitioner's method of accounting fails to clearly reflect income, and the facts of this case were fully stipulated in light of that issue. Indeed, even respondent's briefs are devoted almost exclusively to the "clear reflection of income" issue.

An issue cannot be raised for the first time on brief when its belated introduction prevents the opposing party from introducing relevant evidence on the matter. *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 733–736 (1981); *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958).[5] This is particularly true where, as here, the issue involves a complex factual matter and the party suffering the surprise and disadvantaged by the delay also bears the burden of proof. See Rule 142(a). Because petitioner was not apprised of the need to show that its method of accounting satisfied the requirements of section 1.446–1(c)(1)(ii), Income Tax Regs., independent of the need to show that it clearly reflected petitioner's income, we think it inappropriate to consider the section 446(c) issue.

Our conclusion in this regard is reinforced by the fact that the "billing" requirement to which petitioner was subjected may well be critical with respect to the issue of accruability. Cf. *Decision, Inc. v. Commissioner*, 47 T.C. 58, 63 (1966); *Cox v. Commissioner*, 43 T.C. 448, 456–457 (1965); see *Bay State Gas Co. v. Commissioner*, 75 T.C. 410, 423 (1980), on appeal (1st Cir., Oct. 13, 1981). In a similar vein, it may well be that, depending on evidence that might otherwise have been presented, the

---

[5]See also *Estate of Stubblefield v. Commissioner*, T.C. Memo. 1981–353.

fact that the rate which petitioner's customers must pay turns on the total amount of electricity consumed by each customer during the billing period (see p. 447 *supra*) could impact the accruability issue. Compare *Bentley Laboratories, Inc. v. Commissioner*, 77 T.C. 152 (1981). We are not persuaded by respondent's argument that petitioner's yearend accrual of the amounts attributable to unbilled December customer consumption per se establishes that those amounts were properly accruable for Federal income tax purposes. Accordingly, we turn to the issue posed by section 446(b), namely, whether the meter reading and billing cycle method of accounting clearly reflects petitioner's income.[6]

At the outset, we observe that section 446 confers upon respondent "wide discretion in determining whether a particular method of * * * accounting should be disallowed as not clearly reflective of income." *Thor Power Tool Co. v. Commissioner, supra* at 532, and cases cited thereat. While generally accepted methods of accounting "will ordinarily be regarded as clearly reflecting income" (sec. 1.446–1(a)(2), Income Tax Regs.)—and the parties have stipulated that the meter reading and billing cycle method of accounting is such a method—the differing goals of tax and financial accounting demand that respondent be free to challenge even "generally accepted commercial accounting principles." *American Automobile Association v. United States*, 367 U.S. 687, 690 (1961). In this context, respondent, and not the taxpayer, is entitled to choose between generally accepted accounting methods. *Thor Power Tool Co. v. Commissioner, supra; Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275, 286–287 (1967). The burden of proof is on petitioner to show that respondent's disallowance of the meter reading and billing cycle method of accounting in this case was "plainly arbitrary." See *Lucas v. Structural Steel Co.*, 281 U.S. 264, 271 (1930); *Fort Howard Paper Co. v. Commissioner, supra* at 284.

The stipulation of the parties that petitioner's method of accounting is reflective of general industry practice and in accordance with generally accepted accounting methods is not determinative. Nonetheless, whether a method of accounting

---

[6]The requirement that a taxpayer's method of accounting clearly reflect income imposed by sec. 446(b) is in addition to the requirements of secs. 446(a) and 446(c).

conforms to generally accepted accounting principles is one factor to be considered. See sec. 1.446–1(a)(2), Income Tax Regs.; *Garth v. Commissioner*, 56 T.C. 610, 619 (1971).

A second factor is whether the method of accounting has consistently been used by the taxpayer. *Fort Howard Paper Co. v. Commissioner, supra* at 284, and cases cited thereat; *Heaven Hill Distilleries, Inc. v. United States*, 201 Ct. Cl. 423, 476 F.2d 1327 (1973). While not dispositive (*Coors v. Commissioner*, 60 T.C. 368, 395 (1973) ("A failure to clearly reflect income over many years cannot be justified on the grounds of tenure")), it is an important consideration entitled to considerable weight. *Photo-Sonics, Inc. v. Commissioner*, 42 T.C. 926, 935 (1964), affd. 357 F.2d 656 (9th Cir. 1966); compare *Lincoln Electric Co. v. Commissioner*, 54 T.C. 926 (1970), affd. 444 F.2d 491 (6th Cir. 1971). In the instant case, the parties have stipulated that petitioner has reported its income using the meter reading and billing cycle method of accounting since 1934, that the issue involved herein was considered on the examination of petitioner's returns for the taxable years 1934 and 1938 (see note 3 *supra*), and that respondent proposed no adjustment at that time nor during any of the ensuing taxable years until 1974. While we recognize that, generally, prior favorable consideration of an issue on audit does not bind the respondent, we think that, under the circumstances of this case, such consideration, coupled with the longstanding absence of challenge by respondent, is a factor to be taken into account. Compare *Fort Howard Paper Co. v. Commissioner, supra* at 286, with *Pierce Ditching Co. v. Commissioner*, 73 T.C. 301, 306 (1979), and *Hotel Kingkade v. Commissioner*, 12 T.C. 561, 568 (1949), affd. 180 F.2d 310 (10th Cir. 1950).

A further factor is whether the taxpayer's method of accounting corresponds with accepted industry practice, particularly in the case of a heavily regulated industry such as that involved herein. See *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 556 (1979). The parties have stipulated that the meter reading and billing cycle method of accounting is accepted in the industry and is used by a majority of major public utilities. In addition, the Internal Revenue Service "has recognized that both monthly and bimonthly meter reading and billing cycle reporting methods are applied by public utility companies in accordance with

accepted practice in the industry." Rev. Rul. 72–114, 72–1 C.B. at 125.

We recognize, of course, that there is a problem involved herein due to the fact that petitioner's costs of producing and delivering the electricity generating the unbilled December revenue were deducted when incurred and that such revenue was reported as income in a subsequent taxable period. Thus, there was not a matching of revenues and related expenses. However desirable such matching may be as a general objective (*Commissioner v. Idaho Power Co.*, 418 U.S. 1, 11 (1974); *American Automobile Association v. United States, supra* at 692, cf. sec. 1.471–11(a), Income Tax Regs.[7] ), the fact of the matter is that matching of income and deductions is not absolutely essential. It is well established, for example, that income must sometimes be recognized even though a related deduction has not yet matured. E.g., *Schlude v. Commissioner*, 372 U.S. 128 (1963); *American Automobile Association v. United States, supra.* Similarly, a mismatching of items of income and related items of expense occurs when the value of the income can be reasonably estimated while the expense cannot be, for, in that case, deductions must be deferred although income may be accruable. *Patsch v. Commissioner*, 19 T.C. 189 (1952), affd. 208 F.2d 532 (3d Cir. 1953).

We have considered the foregoing factors as well as petitioner's heavy burden of proof. "in light of the particular facts and circumstances of [this] case with reference to the particular business involved, the particular method [of accounting] employed, and the specific item at issue." *Fort Howard Paper Co. v. Commissioner*, 49 T.C. at 284. Practically all of the salient factors weigh in on petitioner's side.

We conclude that, in the posture of this case, petitioner's method of accounting does clearly reflect income, and, therefore, we hold that respondent has abused his authority by requiring petitioner to recognize the unbilled December revenue in the year of use by the customer merely because its failure to report such revenue for tax purposes did not conform

---

[7]Respondent has not argued that petitioner must use an inventory method of accounting (see sec. 471), and we do not reach petitioner's argument that it sells a service rather than a product.

with its treatment of such revenue in its books and financial statements.[8]

*Decision will be entered for the petitioner.*

---

[8]We also note that where Congress has thought conformity with financial statements a desirable objective, it has specifically so provided by statute. Sec. 472. Cf. *Insilco Corp. v. Commissioner,* 73 T.C. 589 (1979), affd. without published opinion 659 F.2d 1059 (2d Cir. 1981).